The next matter called is 120448, Chultem et al. v. Ticor Title Insurance Co. et al. Agenda No. 7. Council ready? You may proceed. May it please the Court, Counsel. My name is Steve Tillery. Todd Smith and I are here today to speak on behalf of the plaintiff's appellants. At its essence, this is a case about kickbacks. Defendants created attorney-agent programs to disguise the fact that they were paying their attorney-agents for the referral of business, not for performing court title agent services as required under RESVA. In reality, defendants performed those same services, then paid the lion's share of the title insurance premiums to those attorneys. The troubling or one of the most troubling aspects of this is that in the closing form, the HUD-1 forms that are required to be used in all of these residential transactions, there's a section on the second page starting at, I think, section 1100 through 1108, and in those sections throughout the entire class period, they failed to disclose this to the buyer and seller in the transaction. It's worth noting at the outset that when this case was appealed the first time on the question of class certification, the unanimous appellate court relied very heavily on the HUD 1996 Statement of Policy in reversing the denial of class certification and ordering the classes certified. Even further, that same court relied on that same policy statement, the 1996 HUD Policy Statement, when it sent the case back to the trial court with very specific instructions about the two issues that needed to be resolved on remand. One, whether defendants' Chicago title and TICOR could lawfully pay their attorney-agents full compensation after sending them a pro-forma title commitment. And two, whether Chicago title's preliminary commitment and TICOR's A-exam were pro-forma commitments as that term is defined by HUD. So in other words, these questions, the entire analysis on class certification and the orders entered by the appellate court were based virtually exclusively on RASPA regulations, including the HUD Policy Statement 1996. The appellate court relied directly on the 1996 Statement of Policy when it held, and I'm quoting now, if plaintiffs are able to prove at trial TICOR's A-exam and CTI's preliminary commitments are pro-forma commitments and defendants cannot lawfully send their attorney-agents pro-forma commitments and pay them full compensation, they will prevail on their individual claims and will have established a right to recovery for all class members regardless of the services provided or performed by said attorney-agents, end quote. In other words, the appellate court ruled that there was no transaction-by-transaction analysis that was necessary that would preclude class certification and sent it back down for those reasons. On remand, when the trial court entered summary judgment for the plaintiffs on the first question, she relied directly on the same Statement of Policy. Quoting from it at length and using its definition of a summary judgment for the plaintiffs. That was a few months before trial. It was in, I think, March 1st of 2013 and our trial was in September. So at that time, we were guided by the Statement of Policy, which where the trial court actually granted summary judgment for the plaintiffs. Going further, she found that the HUD 1996 Statement of Policy is a reasonable interpretation of RASPA and is consistent with the statutory language of RASPA. In short, she gave deference to that HUD Policy Statement in ruling that defendants could not lawfully pay their attorney-agents the full contract compensation after sending them a pro forma. And with respect to Freeman, which is a case I'm going to spend virtually all of my time talking about, she knew about Freeman, she cited Freeman, and she relied on Freeman as a basis for distinguishing the holding in the Cohen case about compensation for duplicative services. So we have this unusual circumstance here in this case. We've had class certification and summary judgment entered, ordered, in reliance in large part on a Statement of Policy of HUD, 1996 Statement of Policy, and then at the end of the case, after the trial, no deference granted and judgment entered by rejecting that holding or that interpretation of exactly the same policy statement. Despite very clear evidence, and I think we've made it clear in our briefs that we don't really challenge the factual findings of the trial court, there may be a couple of things and we point that out in our briefs, but by and large, the factual findings of the trial of the Freeman v. Quicken decision, we strongly dispute and question. And we believe that the lower courts erred in giving a far too expansive reading of that case. There are obvious and important distinctions between the cases before the court today and the Freeman v. Quicken decision. There are different issues, different language in RASPA, different claims under RASPA, and different HUD policy statements and regulations. Freeman concerned a single service provider, Quicken Loans, a mortgage broker that was alleged to have violated RASPA Section 8B by charging consumers a loan discount fee without giving them a lower interest in return. The U.S. Supreme Court stated that in discussing what was before the court, what the sole issue was before the court said, and I'm quoting, the dispute between the parties boils down to whether this provision, RASPA AB, prohibits the collection of an unearned charge by a single service provider, what we might call an undivided unearned fee, or whether it covers only transactions in which the provider shares a part of the settlement service charge with one or more other persons who did nothing to earn that part. Based upon RASPA 8B's clear language, quote, no person shall give and no person shall accept, end quote, a settlement charge, the Freeman court ruled that two actors are required, looking directly at the language of 8B. So it cannot be violated by a single culpable actor of a service provider. The Freeman court then did not follow the 2001 Statement of Policy, a different Statement of Policy, when it decided that case. That really is, in our view, the only holding of Freeman v. Quicken. Here there is no question whatsoever that the title insurance premium in these cases was divided between two persons, the defendants and their attorney agents. So the Freeman court's holding doesn't really directly impact what we're discussing here today. The cases really involve completely different issues. What is really involved in these cases, in contrast to Freeman, is the issue of what the safe harbor provisions of 8C mean when we talk about actually performing the service. Whether defendants, attorney agents were actually performing those title services. And unlike the clear language of RASPA Section 8B requiring two separate actors, RASPA is not clear on what it means to actually perform services. Let me ask, I guess ask these questions to explain it. Is an attorney agent who performs services that merely duplicate those already performed by the title company actually performing services? If a title company does the title search, generates a pro forma, identifies basically, not basically, all of the information in Schedule A and B of the title policy, and then pays the lion's share of an entire premium to the attorney, is that attorney performing a determination of insurability or poor title services? Is an attorney who performs exactly the same services that he would have to perform in representing the buyer or seller in the transaction actually performing services to be paid separately by the title company? RASPA is silent on what it means to actually perform a service. Is there any difference between performing core title agent services and actually performed services used in different parts of the Regulations and Act? Your Honor, in terms of whether there would be a separate definition, no. There really isn't. The one thing that you would see in the core title services in 24 CFR, I think it's Part 3500, in that section in the description of core title agent services, the Court goes on, and that was early on in the history of RASPA, and describes very, very clearly what's required. In other words, you have to do all these steps, but they all typically amount to a determination of title insurability. And that's what Mr. Rooney, Mr. Hobfall, the plaintiffs experts in the case, discussed at length here. What are we really getting at? Title companies don't want somebody who doesn't really have their eye on the ball making a determination and put them at risk. So they want to do all of this themselves, make sure their risk is handled, perform this determination, identify what's in Schedules A and B, and send that to the attorney agents, and they can remit 70, 80 documents sent to the attorney agents, fulfilled some, but not all of the requirements for a pro forma commitment. Does that mean that the plaintiffs could not actually prove liability for de-splitting? Well, in other words, if it were not, if they didn't have like the, there's no question in the CTI case, they actually, in the Colala case, the document they sent as the pro forma was the final document used in the case for the parties. I mean, it was a pro forma, a preliminary and final. It was the document. The only difference would be, and I'm not, I'm going to directly answer your question, Your Honor, but the only difference would be that in the Tycor case, they had everything from Schedule A, everything from Schedule B, all of those determinations of title insurability. The only thing left out was some language that would be attached to every one that's boilerplate language. Everything else is exactly the same. And if you look at the order entered by the trial court, I think probably starting at paragraphs 5 through like 13, there's a description of the services that determine exactly what happened in this case, which we absolutely do not dispute. Those are a concise discussion of what took place. Those effectively establish a pro forma. What our dispute is, is with the court's interpretation of the law about how all of these add up. So we don't dispute those facts because we think that captures the essence of what happened here. Did the trial court find specifically that these were pro forma commitments or is there some issue with that? The one, I can find the language in the order if you want me to, Your Honor, but the one, the CTI, she said very clearly that this was the final document in the, the difference here, and here's the problem, is that the defendants convinced the trial court that a pro forma can't be entered, there is no pro forma until the closing is completed. In other words, the pro forma can't continue or can't be finalized until you do all this work, go to the closing, and you have this document. Well, we submit that that's really not an accurate read. Our experts said that a pro forma commitment is a pro forma of a preliminary commitment for title insurance. It's a road map to the attorneys for what they have to do. So you send this out early, it says you go get this, you do this, this, and this, and then once you take care of liens or make sure the mortgages are done, you get this stuff done, then you can proceed to the closing. Well, this pro forma in every case meets the definition of what the expert said and what HUD said. And what the defendants convinced her of was that you have to wait until the end. Well, in that case, then there's no difference between a final insurance, title insurance policy and a pro forma, and that can't be the case. So back to your, Justice Carminer, back to your point and to answer you more directly, sir. The real thing she said, the CTI is in fact the final document. She said that Tycor didn't have this boilerplate language in it, but she used that definition of pro forma that I just told you. So if you apply that definition, of course, there's never a pro forma. There never can be. And there would be, under that definition, there would never actually ever be any possibility of a claim. Your opponent suggests that what you're really arguing about is the trial courts finding that there was some work done and the difference between some work and enough work to make this not a pro forma. It's really, you know, a matter of degree. The trial court finding that some was some, and that really what you're talking about is an excessive fee for doing what you would see as a minimal amount of work. Is this a fee case? No, it's not, Your Honor. It's not a fee case at all. And that, I think, is part of the confusion. The second prong of Freeman versus Quicken, which really wasn't involved in that case because the defendant in that case admitted and everybody agreed there was absolutely no service provided, okay? But the discussion that took place there seemed to refer to say that there's no claim. It's not a price control statute. RESPA is not a price control statute. We're not claiming we paid $100 for $50 worth of service. That's not our claim, okay? That's been the disconnect in this case. And to the extent, as the trial lawyer and appellate say, that's not our problem. But I think that's a big, huge disconnect. Well, let's play that through a little bit. We go back. The court said some work was done. And you're saying, well, that whatever work, you don't dispute the facts, that whatever work was done was not enough. Here's what we're saying. We're saying that under the HUD regs, the report 3500, and under the 1996 policy statement, which I'll read from my notes in a minute to further address this, that it's not a question of the excessiveness of the fee. It's a question of the entitlement to the fee. If you don't perform the core title services as defined in Part 3500, you're not entitled to this fee. And that's it. And that's set out very clearly. So it's not a question of whether they did something. And the only thing they could ever find that they did, that they thought that might be separately compensable, was waiving exceptions at closing. And even then, that was explained because in every case, the defendants had to have the right to have somebody there to approve their waiver. So even that, if you look at everything they did, it was duplicative of their obligation for services to the buyers and sellers in the underlying transaction, in every case. Is there a case-by-case analysis that we're talking about here? No. And I think the appellate court's decision on that is correct. Once they send the pro forma, once they indicate and send that pro forma to the attorneys, and here, this I think will answer both of the questions further. Under the Statement of Policy 1996 of HUD, when an attorney receives a pro forma from the title insurance carrier, the attorney agent is not entitled to payment. So it's not a question that they got too much, or they didn't perform enough service. If, and I'm quoting now from that section, if the title company provides its title insurance agent with a pro forma commitment, typing or other document, preparation services, the title insurance agent is not actually performing those services. As such, the title insurance agent would not be providing core title services for the payments to come under Section 27C1B. So there's no way. That's not to say they couldn't have chose to pay them under 8C. They could have. But that wouldn't have been for performing a determination of title insurability. Had they done that, it would have been for a total premium amount in return for sending the case. So you're saying that once there's a pro forma, it's a per se violation? Correct. And it absolutely is. And the question then isn't which, it's a question of what you pay them under. And here, these two classes are confined to only transactions where the they send an order for title insurance. The only thing permissible under HUD-REX is to send them title evidence. And the testimony in this case is the attorneys didn't even get the title evidence and most of it didn't have half of it where they could have even made this determination. So the determination is made on the request of the attorney agent is made by the title company and then sent back to them. And all they did in this case was just accept it because they did not sign off or change anything. Thank you. Thank you, Mr. Tillery. Mr. Brody? Good morning and may it please the Court. Michael Brody on behalf of Chicago Title, Tycor, and Fidelity National. Mr. Tillery has created some confusion about what the attorney agents did and what the proper legal standard is under RESPA. And I would like to start by addressing those points. First, under the attorney agent programs, what is it that the attorney agents did? I think plaintiffs ignore that we are here on an appeal from a trial verdict. And in a trial, there is a winner and a loser and facts are found. And because this was a bench trial, the facts that were found were written down and they cannot be challenged. And I just heard Mr. Tillery saying he was not challenging them. So what did Judge Mikva find as a matter of fact? Well, Mr. Tillery spent a lot of time talking about pro forma commitments. Judge Mikva found that the plaintiffs failed to recognize that the defendants in fact issued pro forma commitments. Under the Florida Statement, there are four elements of what is a pro forma commitment. And she found that some of those elements were satisfied, but all of them were not. What else did she find? She found in her lengthy opinion that services were actually performed as RESPA requires. She found that the attorney agents provided necessary, valuable, core title services and that they were not duplicative. They were distinct from the services they provided for their clients in the transaction. She found that the attorney agents directed the title company to clear exceptions and clear liens as is required to issue a policy. She found that the attorney agents played the key role of determining insurability. That's what attorney agents do. They determine insurability. And Judge Mikva found as a matter of fact that the attorney agents played that role of determining insurability and that that role was ongoing up to and through the closing. So if the transaction started with the issuance of a pro forma commitment, which it didn't, I'll get to that in a moment, that wasn't the end of the game. The attorney agents were involved in the title exam. They issued the title commitment. They cleared exceptions. They determined the insurability of the deed and mortgage. They attended the closing. They assumed personal liability and they retained records. Okay. Those are core title services found as a question, as a matter of fact by the trial judge here. That resolves the claim about whether services were provided. They were. They were not duplicative. Judge Mikva found that the Illinois regulators looked at this program on a regular basis. One of the regulators testified at trial and he testified that it was in compliance with the requirements of Illinois law and Judge Mikva so found. So those facts cannot be disputed. The plaintiff's expert conceded that the attorney agents provided services. Now he said the value of those services and this gets to Judge Tice's question about the fee. He said the value of those services were 20 to 50 percent of the premium that the attorney agents paid. Judge Mikva refers to that in finding of fact 24. We think that's too low an estimate as I'll address. But even if it was only 20 to 50 percent, the attorney agents provided valuable services and that attorney Cohn who did the title work in the Colella transaction testified that he spent more time on this transaction on behalf of the title company at his hourly rate than he was compensated for. So he spent more than 100 percent of the fee he received. That's what the evidence was and that was the basis of the findings here. So on this first question about were services provided, absolutely. Was a pro forma commitment provided? Judge Mikva found as a question of fact, no. And I think that puts a big dent in plaintiff's argument. But second, what's the proper legal standard? And Mr. Tillery talks about the regulations and the requirement of a pro forma. The term pro forma commitment is not in RESPA. Plaintiffs look to a 1996 Florida enforcement guidance and I'll address that in a moment. But the statute as the two lower courts here addressed creates a binary test. If the attorney agents provide services, yes or no. If they provide services, it's not a violation of services. Mr. Tillery cites no case that reaches a contrary result. Now is that a correct interpretation of the statute? Is what the two lower courts did here a correct interpretation of the statute? And the answer is yes. And first I would direct the court to the words Congress used in RESPA. Congress used the language that we keep coming back to, services actually performed in Section 8B, the fee splitting section and in Section 8C, the exemption, the safe harbor sections. And that language has been interpreted over and over by court after court to create this binary standard. Plaintiffs look back to the 2010 Appellate Court opinion, which this court did not review. In that opinion, the Appellate Court took as true the allegations in the complaint. And the complaint alleged that there were no services provided at all. If you look at the Appellate Court opinion, it repeatedly says the complaint alleges, the complaint alleges, plaintiff pleaded and so on. And that's what the court was relying on and it says so explicitly. It reversed the denial of class certification in error because the circuit court had looked at the facts rather than the allegations. But the plaintiff's first claim in this case, and it's what was alleged in the complaint and raised in 2010, was that there were no services provided. As I've shown, we had a trial and Judge Mikva said that was not the case. So then plaintiffs have pivoted in two ways. First they argue this all or nothing theory. You have to provide all of the services in order to recover full compensation. That's not supported by any of the cases and Freeman is really the place to look there. Plaintiff says Freeman arises in a different circumstance and that's exactly right. In Freeman, there was a single service provider, but the plaintiff argued, relying on HUD guidance, similar to the Florida statement in this case, that you should treat the money paid to that single service provider as if it were split. As if it were split between a compensation for a legitimate service and then an excess compensation that was not earned, an unearned fee. The Supreme Court said that that was manifestly in error. It was a palpable overreach. It ignored the statute that HUD was called upon to interpret. The regulation, 3500, cited in one of the footnotes, and the guidance specific to the Freeman case that adopted this theory, the Supreme Court said could not be followed. Well, that's the same distinction that HUD made in the Florida statement, distinguishing between earned fees and unearned fees. And that's why the two lower courts here found Freeman to be so relevant. And the court concluded, the Supreme Court, U.S. Supreme Court concluded that RESPA was not ambiguous. You didn't need to look beyond the words of the statute to the regulation. So you wouldn't even look to the administrative guidance at all. And it said that RESPA was not about whether the price paid for a service was too high. It was this binary test. If you provide a service, you satisfied RESPA. And the Supreme Court pointed out that when RESPA was passed, there was a question about whether RESPA should be more of a price control or price guidance statute. And HUD was directed to report back if those kinds of changes needed to be made to RESPA. And it never did. Those changes were never made. So as the appellate court correctly found here, and as the circuit court correctly found here, Freeman goes a long way to answering the question in this position in the case it never reached the issue of what the measure of damages would be. Is that correct? That's correct. But there's an argument about what the damages are. Mr. Tillery started out saying this is about kickbacks. I thought the argument was there was no change in the, or your argument was there's no difference in the amount of the fee charged whether there was a kickback or not. Correct. I bristle at the word kickback. There wasn't a kickback. But that's exactly correct. The title companies permitted title insurance to be purchased through the involvement of attorney agents or without the involvement of attorney agents. And if it was without the involvement of attorney agents, there was no split of the premium. And in both cases, the fees were the same. So if a customer wanted to do without this Illinois during the time period were substantially lower than rates elsewhere. So this was not contributing to an increase in fees in Illinois. But there was no difference in fees to accommodate this practice. It was just the way the title company chose to allow the work to be done. And then let me turn again to the Florida statement. Mr. Tillery relies on the Florida court should defer to it. We contend that's incorrect for legal reasons and for factual reasons. Legally, the Florida statement is inconsistent with RESPA. As we argue in the briefs and as I've tried to explain, it applies a different standard than the interpretation of RESPA by every court to interpret it. It looks to a pro forma commitment. Words not found in the statute. So legally, the Florida statement is incorrect. And the briefs go into that in detail. We also argue legally, given the United States Supreme Court's determination in Freeman, that RESPA is unambiguous. There's no reason to defer. There's no reason to look beyond the words, the unambiguous words of the statute to an agency action. Legally, the Florida statement says it's not intended to provide guidance to companies like my clients as to what they're to do. It's not intended to create standards that parties are to follow. So legally, for a variety of reasons, the Florida statement has no application here. But Judge Mikva also ruled on the statement factually. And she concluded, even if you reject all of those legal arguments, that the plaintiffs didn't prove that pro forma commitments were issued here. That's in her opinion at page 14. And that finding, which the plaintiffs cannot challenge, was correct. Let me ask you this. Factually, in the record, what was Judge Mikva's definition of what a pro forma was that was found not to have been issued? She applied the standard that the plaintiffs advocated, which was the four-part standard from the Florida statement. The Florida statement defines what is intended to be a pro forma commitment. It has four elements. The plaintiffs quoted in their brief in this court. And that's the standard she applied. Well, help me out on this. What's the distinction between the pro forma and what, at least I used to know, was called a preliminary title insurance policy? Well, what the title companies provided to their attorney agents here at the beginning of the process was the title evidence from the prior issuances of title on this existing property. So they would generally provide the information relating to the last title policy, which would again be out of date. It would have liens and mortgages that were no longer current. And it would collect those in a package and send them to the attorney agents. And what's the distinction between the two? That's my question. What's the distinction between that and a pro forma commitment? Right. Well, that is not a pro forma commitment because there were important steps that would need to be taken between the provision of that initial information and the issuance of title insurance. And that's what Judge Mikva found when she concluded that the attorneys were involved throughout the process in clearing liens, in making sure that the new mortgage and any new liens were properly listed in the policy, and determining the insurability of the title up through and including the point of closing. So the information that was issued to the title agents at the beginning of the process was title evidence, as we argue it. Mr. Brody, but I think you said before that oftentimes there's no attorney involved at all. And the fee for providing services is exactly the same. So why would the title company want even an attorney involved? Because then they would be able to keep, you know, or have the same amount of money. They would do a, I'm not saying there wasn't someone involved in clearing the title. But who? If it's not an attorney, then it would be somebody from the title company? It would be done internally at the title company. Internally? Yes. Yeah, so. And there were attorneys involved in that process at the title companies, but they were not the attorney agents we're talking about in the attorney agent programs. And there were people involved throughout the closing process and... But you didn't, but the title company didn't give 40 to 50 percent of the fee to the agent, because there was no agent. There was no agent, correct. Right. So the price was the same. I've spoken about the services that were actually provided here and I've spoken about the legal standard. I'd like to briefly address a couple of additional points. The attorney ethics issue and then some class certification issues. I'm not sure if the court is concerned about the issue of attorney ethics. It was raised in the, I know the court is concerned about the issue of attorney ethics. I mean, in this case. It was raised in the motion for reconsider the denial of the petition for leave to appeal. And we explained in our response brief that the programs here operated in a way that complied with every element of the Illinois Rules of Procedural Conduct. That Rule 1.5 was satisfied, Rule 1.7 was satisfied, Rule 1.8 was satisfied. And if the court has questions about that, we'll address it. But the main point I'd like to make about this issue is the claim, which the plaintiffs seem now to have abandoned, is not a basis for RESPA liability. The claim in this case isn't that an attorney violated duty, which we think did not happen. The agents behaved properly. But whether the title companies violated RESPA by the way they set up these programs. And as to that, Judge Mikva concluded that they did not violate RESPA. And the more specific attorney ethics issues have been waived. And I'd also like to briefly address the issues relating to cross-relief. We are here on an appeal of a class verdict. The class was certified by the circuit court after the first appeal. And we believe that was an error. De-certification was compelled in this case by the court's ruling in the Mashall decision and by Howland. And I'd like to briefly address the Howland case. Howland is a case in the federal courts. It was brought in the district court in Chicago by these same plaintiffs, these same plaintiffs' counsel, but against a different title insurance company. And the district court ruled that a class could not be certified. And the Seventh Circuit affirmed. And in rejecting the class, the court found that even if you accept plaintiffs' pro forma commitment theory, there are so many factual issues that go into whether a pro forma commitment was issued in a particular case, what the value of services that were provided are, and even whether RESPA applies at all. And a variety of other issues that the matter cannot be maintained as a class. And I close on that case because, as I've said in the briefs and as I've said today, there are no cases, and I mean no cases, in which a court has upheld the theory the plaintiffs assert in this case. And the closest we can get to the controversy we have before us is the Howland case, where on essentially the same facts alleged by the plaintiffs in this case. All of the other cases that we cite establish a number of other principles that are dispositive of this case. They establish that RESPA is not ambiguous, and therefore you don't need to look at the regulations. They establish that RESPA establishes this binary test. If any services are provided, then the requirements of RESPA are met. And under those standards, the plaintiffs cannot prevail. But Howland is an important case if the court were inclined to look at the class issues, because it arises on exactly the same facts we have here, and the court concluded there could be no way for a class to be certified. Plaintiffs have had their day in court. This case has been pending for a long time, and they've been given every opportunity to prove their case. First, to prove their claim that no services were provided, which they failed on. And then the additional claims they've made, the all-or-nothing theory and the Florida statement theory, which the circuit court rejected primarily on factual grounds, but also on the legal grounds we assert. Under the unambiguous language of RESPA, plaintiffs do not have a claim here, and the trial verdict and the ruling of the appellate court should be affirmed. So unless the court has any additional questions, I'll close there. Seeing none, thank you, Mr. Brody. Thank you. Mr. Smith. Thank you, Your Honors. May it please the Court, a case that is factually barely at the threshold of RESPA, the Freeman case, is a case that they ask you to say controls here. That was a square peg trying to be put into a round hole. It simply was not a RESPA case. They tried to make that work with that single-payer provider. We are actually both 2607A and 2607B. The key, key difference here that was not in Freeman, that is here, is this referral with that second person. Because the Congress was looking to prevent, prohibit, indeed, eliminate payment for referrals. Now, you'll note that the services provided or performed is the way it's phrased here. The language actually in this statute says four services actually performed. Four was missing in their analysis. The payment has to be for those services. And that's where HUD comes in. HUD isn't trying to regulate what's going on with this amount that's being kicked back. And by the way, two judges so far in this case have said these are kickbacks. The trial court called this, these are no doubt kickbacks. She said that on February 22nd, 2013. Justice Paczynski below called these kickbacks. You know, the question becomes, are they performing actual services? Are they getting paid for those actual services? We've shown they were not. There is a set fee that are in the contracts for these referrals. There's a contract, a written agreement, and that's the difference. They don't have that in Freeman. It was single-payer. Here you have two players. There's a contract under 8A. And so when that happens, you have a whole different ballgame. And they're kicking back money and they're holding this lump sum fee at 80% or whatever it is. All HUD is doing, not trying to regulate the amount that's being paid in any way. They're not putting a number on it. They're putting a service minimum level on it. You've got to perform these four services to be paid for the services. Now they may get paid an awful lot, and some people may question why that is, but HUD's not putting a cap on that. So there's not a problem in that regard. Was the trial court's finding against the manifest weight of the evidence or was it an error? Was the trial court's finding here on that issue about the services, was it an error in your opinion and the application of the law? In the application of the law, because she actually did not follow the pro forma definition. That was pointed out in the dissent. She actually followed some of the elements of 3500. But the truth of that is, and the dissent pointed this out, and I would like to reiterate those for you, she actually found the following. Because if you look at their findings of fact other than the holding, her findings of fact absolutely support what we're talking about. So it's an application of the fact she actually found. They were sent, the lawyers were sent on this pro forma, on this document, the A exam and the preliminary commitment, evaluation of the title search. The title companies did that. Paragraph 8 of her findings of fact. And it's an evaluation of the title search to determine insurability of title. The seller in this case, the lawyer that's bringing the case, referring the case, that's most often the seller. The seller's duties at paragraph 23 of the findings of fact, clearance of underwriting objections. So he's already doing it. That's not for actual service performance. Actual issuance of the policies. Paragraphs 19 and 20 indicate they were issued by the companies ultimately. And I think Mr. Cohen may have signed off, but he acknowledged that it was actually prepared by and then sent out by the company, Chicago Title. Tycor absolutely issued the policy. Issuance of title commitment. Tycor, paragraphs 12 and 13. That was what she discussed about the various features of this that they received, the A and the B exam, essentially. That's the core of it. And then Tycor would plug that into the, back at Tycor, would plug that into their boilerplate and sign off on it. Tycor did all the work related to that. Conducting of the title search. All done by the company's paragraph 6 through 10. Issuance of the title commitment. I pointed out 12 and 13 for Tycor. CTI, 15 and 18 paragraphs tell you that. The dissent below also matched up. She actually, the trial judge used 3,514 in terms of her analysis, not the pro forma, but the trial court, pardon me, the dissent below matched up all these services with the pro forma itself. And in her opinion found every single one of them. I wanted to address a couple of things about Freeman that I need to get out. One, Justice Scalia called this in the second to last paragraph, in response to the petitioner's point, he called this an absurdity. And what he described as the $1,000 work for a $1,000 fee. That's what he said was an absurdity here. He then went on to say that could be a violation of the, could avoid, pardon me, could avoid a violation. But what he said was a violation was back at, he did say it was a violation. He used the word would. And what I'm trying to point out is when he's describing that example as a could with no factual hypothetical provided, he's simply, and it is, it's dictum. Back at a couple of pages earlier, he's talking about the example of giving sporting tickets for the referral. He said that would violate 2607A. No written understanding, but an agreement. Here we have a written understanding. They're having to perform, we say, a minimum amount of services in order to get this steady, always the same number. What is all of that for? And by the way, at paragraphs 26 and 27 of the findings of fact, Judge McPhus said essentially these companies acknowledge that what they're doing is trying to make their programs as attractive as possible for the lawyers compared to the other competing companies. Why are they doing that? They're trying to get the referrals in. Of course, that's the only reason. So what they're then doing is we're going to keep increasing the percentage that we are giving you and we are going to, and they said this, we're trying to keep the services as small as possible for the lawyers. That's in the findings of fact 26 and 27. And when they actually get something that says change this name after they've gotten the pro forma, they basically ignore it, and that was in finding of fact number 27. Justice Scalia did not have a referral case in front of him. Justice Scalia did not have a situation that Congress was trying to prohibit here. Kickbacks of anything, and it says anything of value, and you'll find the definition for anything of value at 2602 in a letter. I can't say the definition is very broad. It could be both what Judge Mitva said, she actually said it page three of her first order, that these were payments made for the referral of business. That's out and out of violation. Congress has said... May I ask you a question? Sorry to interrupt you. Can you address the damages question? Yes. The statute itself actually addresses the damages question. 2607 in there. And it basically says the damages are the charges that have been made. That's what it says. This is a violation. It's for the charge. I think that's right off the bat, and the Beaton case that we cited in our briefs talks about the charge being the damages. In addition to that... Is this another case coming under the Consumer Fraud Act? Pardon me?  Yes, but also under the Title Act as well. So under the Consumer Fraud Act, do you have to show actual damages? Well, you have to. I think we did. What we did was we said they wouldn't have gone through with this. Both of our plaintiffs indicate they would not have gone through with this. They would have not paid this kickback situation. So that's their damage. But the homeowner, the buyer, who were actually involved in this transaction, could have gone without a lawyer, and what we've heard is the price would have been the same. Well, the price... I ultimately don't think that's the issue. Eventually, what should happen here is that the cost of actually... The insurance should be at a certain number. That hump is going back in kickback. Absolutely. Once you get competition going, isn't it natural that they're going to show a reduction? It would never have remained the same if this law was being enforced, and that's what Congress was all about in this, trying to prohibit these kickbacks because it does increase the costs. That's why these costs are up where they are, because the kickbacks are involved. They can't go on charging one fee over here and another fee to somebody else. The money's getting kicked back for the referrals. I don't think there's any question the trial court found that. She found additionally that the work is being kicked back in her second order. So both money being paid, the work being given, and of course the work being kicked back was a cover for the payment that she found the company said they were trying to reduce completely. Not trying to control prices, but here trying to control that money being used to get the referrals. That's exactly what we have going on here. We would ask that the court reverse the trial court below and send it back for the administrative proceedings. Thank you. Thank you. Case number 120448 will be taken under advisement as agenda number 7. Thank you, counsel, for your arguments this morning. You are excused. Mr. Marshall, the Illinois Supreme Court stands adjourned until Wednesday, January 18th at 9 a.m.